**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| B.S., a minor, by Natalie M. R. Burston, Esq., Guardian *Ad Litem*, | |
| Plaintiff | Case No. 1:17-cv-01789 (Judge Jennifer P. Wilson) |
| v. | |
| YORK COUNTY, *et al.*, | |
| Defendants | |

---

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

Plaintiff B.S., a minor, by Natalie M.R. Burston, Esq., Guardian *Ad Litem*, hereby files Plaintiff's Counterstatement of Material Facts, which supports Plaintiff's opposition to the Motion for Summary Judgment filed by York County, Jacy Niemiec-Colin, and Ashley Rohrbaugh.

### Ronald Witmer graduated high school, joined the Army, was discharged for misconduct, and then returned to York County.

1.      In 1985, Ronald Witmer ("Witmer") graduated from high school. (Exhibit 1, Witmer Depo., p. 20:1-3).

2.      While still in high school, Witmer joined the US Army. (Exhibit 1, Witmer Depo., p. 20:4-10).

3.     In 1986, when Witmer was approximately 19, he was raped by a fellow male soldier while in Germany.  (Exhibit 1, Witmer Depo., p. 26:10-22).[1]

4.     In 1987 or 1988, Witmer was discharged from the Army because he was accused of having a sexual relationship with a fellow male soldier.[2]  (Exhibit 1, Witmer Depo., p. 21-22).

5.     After he was discharged, Witmer moved back to York County.  (Exhibit 1, Witmer Depo, p. 27:20-25, p. 28:1-2).

**Ronald Witmer sexually abused a 4-year-old boy in 1989.  Witmer was charged with and pled guilty to the crime.**

6.     Shortly after Witmer returned to York, on March 3, 1989, police received a report Witmer sexually abused a minor, initials C.S.  (Exhibit 2, Windsor Twp. Police Department Report).

7.     C.S. was Witmer's relative; C.S.'s father was Witmer's cousin. (Exhibit 1, Witmer Depo., p. 30:11-25).

8.     York County's Office of Children, Youth, and Families ("York OCYF") was notified by the Windsor Twp. Police Department regarding Witmer's

---

[1] Witmer was diagnosed with HIV in 1989; he believes he contracted HIV due to the 1986 rape. (Exhibit 1, Witmer Depo., p. 25:19-23, p. 24:6-24).

[2] At the time, homosexuality was banned in the US military.  (Exhibit 1, Witmer Depo, p. 22:9-12).

abuse of C.S. in March 1989.  (Exhibit 3, March 1989 Letter from York OCYF acknowledging receipt of complaint).

9.     On March 18, 1989, police interviewed Witmer, who admitted he "held [C.S.'s] penis in his hand," for "about a minute."  (Exhibit 2, Windsor Twp. Police Department Report).

10.     As a result, Witmer pled guilty to indecent assault and corruption of minors.  (Exhibit 1, Witmer Depo., p. 29:10-15; Exhibit 4, Oct. 26, 1989 Witmer Signed Guilty Plea; Exhibit 5, Docket Sheet, CP-67-CR-0001045-1989).

## Ronald Witmer sexually violated 2 boys in 1990.  Witmer was again charged with and pled guilty to the crime.

11.     Shortly after Witmer's 1989 plea, on November 12, 1990, 12-year-old T.R. and his parents reported Witmer to the York Township Police Department because Witmer exposed himself to two boys, T.R. and E.M., and forced T.R. and E.M. to expose themselves to Witmer.  (Exhibit 6, 1990 Affidavit of Probable Cause).

12.     Again, T.R. was a relative of Witmer's.  (Exhibit 1, Witmer Depo, p. 36).

13.     On November 13, 1990, York OCYF again became of aware of Witmer's abusive conduct.  (Exhibit 7, Reports of Suspected Child Abuse).

14.     In 1991, Witmer pled guilty to indecent exposure and corruption of minors related to the 1990 incident with T.R. and E.M.  (Exhibit 1, Witmer Depo.,

p. 34:20-25, p. 35:1-5; Exhibit 8, April 15, 1991 Witmer Signed Guilty Plea; Exhibit

9, Docket Sheet CP-67-CR-0000300-1991).

15.     Because of Witmer's 1991 plea, Witmer was sentenced to 9.5 to 23

months in York County jail and served 6 months.  (Exhibit 1, Witmer Depo., p.

39:21:25, p. 40:1-4).

### B.S. was born in 2004, and resided on-and-off with Witmer, B.S.'s paternal step-grandfather, and R.S.'s father.

16.     B.S. was born in 2004.  (Exhibit 10, R.S. Depo., p. 20:1-20).

17.     Witmer is B.S.'s paternal step-grandfather.  (Exhibit 1, Witmer Depo.,

p. 42:9-13).

18.     Between 2009 and 2012, B.S. resided on-and-off with Witmer, splitting

time between Witmer's home and his maternal grandfather.  According to B.S.'s

school records, B.S. resided in each location as follows (Exhibit 1, Witmer Depo.,

p. 48:8-18):

    a.     In September 2009, B.S. was enrolled in the Red Lion School

District and resided at Witmer's address.  (*See* Exhibit 11).

    b.     B.S. remained at Witmer's home until April 2010, when B.S. was

enrolled in the York Suburban School District and resided at R.S.'s father's

home.  (*See* Exhibit 12)

    c.     B.S. returned to Witmer's home in January 2011, when B.S.

reenrolled at Red Lion School District.  (*See* Exhibit 13).

d.      B.S. left Witmer's home for R.S.'s father's address again in July 2011 and reenrolled at York Suburban School District. (*See* Exhibit 14).

e.      B.S. returned to Witmer's house in December 2011 and again enrolled at Red Lion School District. (*See* Exhibit 15).

f.      From December 2011 until November 2012, B.S. resided with Witmer in Red Lion, Pennsylvania.  (Exhibit 1, Witmer Depo., p. 49:1-13).

**On November 9, 2012, B.S.'s mother moved B.S. out of Witmer's home, but a week later York OCYF put B.S. back with Witmer as an "out-of-home caregiver."**

19.      On November 9, 2012, B.S. was withdrawn from Red Lion School District.  R.S. took B.S. from Witmer's home in Red Lion to live with R.S. and her boyfriend, Ryan Doerfler, at 401 Market Street, York, Pennsylvania.  (*See* Exhibit 16; *see also*, Exhibit 1, Witmer Depo., p. 49:14-22).

20.      From November 9 to November 16, 2012, B.S. resided with R.S. and Doerfler in York City, until York OCYF received a report regarding Doerfler's alleged physical abuse of B.S.  (York OCYF's Exhibit 10, Emergency Shelter Petition).  On November 16, 2012, York OCYF got a referral regarding B.S. that involved Doerfler hitting the children.  (Exhibit 17, Niemiec-Colin Depo, p. 34:9-15).

21.     York OCYF caseworker Tess Shortt went to Ferguson Elementary in York City to meet B.S. and his siblings the day of the referral, November 16, 2012. (Exhibit 18, Shortt Depo., p. 11:6-24).

22.     Shortt met B.S. and his siblings at Ferguson Elementary.  She asked them who they felt safe with; the children reported they felt safe with Witmer and Mary Ann Stough (Witmer's wife). (Exhibit 18, Shortt Depo., p. 13:1-12).

23.     Shortt could not recall exactly how, but Witmer and Stough got the children that day (Nov. 16, 2012).  (Exhibit 18, Shortt Depo., p. 14-15).

24.     Witmer recalls someone called from Ferguson Elementary and had Witmer and Stough pick B.S. up from school and take B.S. to Witmer's home in Red Lion. (Exhibit 1, Witmer Depo., p. 50:6-25).

25.     At no point prior to that did Witmer ever consider trying to get custody of B.S. (Exhibit 1, Witmer Depo., p. 88:17-20).

26.     The first time Witmer decided to try and get custody of B.S. was during the dependency process that resulted from the November 16, 2012 referral to York OCYF.  (Exhibit 1, Witmer Depo., p. 88:21-24).

27.     That day, November 16, Shortt went to Witmer's house.  (Exhibit 1, Witmer Depo., p. 52:9-13; Exhibit 18, Shortt Depo., p. 15:23-24, p. 16:2-13, p. 17:4-15; Exhibit 17, Colin/Niemiec Depo., p. 36-37).

28.     Shortt returned to Witmer's home the following day as well, November 17, 2012.  (Exhibit 18, Shortt Depo., p. 15:23-24, p. 16:14-18, p. 17:4-15).

29.     During Shortt's initial visit with Witmer, Shortt asked Witmer about his criminal history; Witmer said he had no criminal history.  (Exhibit 18, Shortt Depo., p. 20:4-16).

30.     Witmer, however, recalls he told Shortt about his 1990 criminal charge, but not his 1989 charge.  (Exhibit 1, Witmer Depo., p. 54:1-8).

31.     Shortt testified nothing was ever communicated to her regarding Witmer's criminal history.  (Exhibit 18, Shortt Depo., p. 22:9-11).

**York OCYF erroneously failed to indicate that Witmer was a "Present Danger" to B.S. on November 16 or 17, 2012.**

32.     Shortt signed a "present danger assessment" regarding Witmer on November 17, 2012.  (Exhibit 18, Shortt Depo., p. 23:18-22; Exhibit 19, November 2012 Present Danger Assessment).

33.     "[I]f children are removed from their home [York OCYF] do[es] that assessment." (Exhibit 17, Niemiec-Colin Depo., p. 22:2-13).

34.     "A present danger [assessment] is done on . . . the home of where the children will be going."  (Exhibit 20, Rohrbaugh Depo, p. 22:5-12).

35.     A "present danger assessment" is used to check out the "out-of-home caregiver to see if there's an immediate threat of harm to the child's safety in that

moment that would prevent them from being placed there." (Exhibit 20, Rohrbaugh Depo, p. 30:1-12).

36. A "present danger assessment" is used to document "easily observable dangers." (Exhibit 21, Almoney Depo., p. 31:3-11).

37. A "present danger assessment" is done in the context of York OCYF's "out of home placements," and in this case Witmer was considered an "out of home caregiver" for B.S. (Exhibit 18, Shortt Depo., p. 24:7-9, p. 25:7-8; Exhibit 19, November 2012 Present Danger Assessment; Exhibit 20, Rohrbaugh Depo., p. 21:23-25).

38. The "present danger assessment" specifically queried whether Witmer had a history of child maltreatment or "history of . . . criminal behavior that affects child safety, such as . . . **sex crimes,** or other crimes of violence against people or property." (Exhibit 19, November 2012 Present Danger Assessment) (emphasis added).

39. Shortt indicated "NO" as to whether Witmer had such a history. Shortt has, of course, since learned Witmer did have such offenses. (Exhibit 18, Shortt Depo. p. 26:4-22; Exhibit 19, November 2012 Present Danger Assessment).

40. Here, the "present danger assessment" is simply wrong. (Exhibit 17, Niemiec-Colin Depo., p. 44:2-9).

41.    The presence of any of the "present danger assessment" criteria indicates the child might be unsafe in that home. (Exhibit 17, Niemiec-Colin Depo., p. 44:10-13; *see also*, Exhibit 22).

42.    "[I]f there are any areas that are marked yes [on the present danger assessment], that it may be not an appropriate placement for the child - - an appropriate out of home placement for the child."  (Exhibit 21, Almoney Depo, p. 33:3-6).

43.    Indeed, if something "would be checked on the present danger as a yes as being a present safety threat, then a child shouldn't be left in that home.  You wouldn't use them as an out-of-home caregiver." (Exhibit 20, Rohrbaugh Depo, p. 31:1-5) (emphasis added).

44.    In this case, the "present danger assessment" was erroneously all clear, so it had no impact on York OCYF, Niemiec-Colin, or Rohrbaugh's assessment of Witmer as B.S.'s caregiver.  (Exhibit 20, Rohrbaugh Depo., p. 31:6-15).

45.    It is obviously important to be accurate on a "present danger assessment."  (Exhibit 21, Almoney Depo., p. 36:1-7).

### York OCYF skipped one of the required safety assessments regarding B.S.'s placement with Witmer

46.    In addition to the "present danger assessment," York OCYF was supposed to complete an "out of home safety assessment" the day B.S. was placed with Witmer.  (Exhibit 21, Almoney Depo., p. 29:3-24).

47.    Here, there is no evidence OCYF completed an "out of home safety assessment" for Witmer/Stough.   (*See* Exhibit 23, OCYF's Timeline) (Note: the "[S.] Timeline" refers to the "present danger assessment" but not an "out of home safety assessment," plus no "out of home safety assessment" was produced by Defendants in discovery).

**York OCYF's shoddy practice regarding "present danger assessments" and criminal records in 2012.**

48.    Shortt did not check whether Witmer might be lying about his criminal history, as in 2012 the "clean query" (i.e. the background check) could take a "couple days." (Exhibit 18, Shortt Depo., p. 27:8-19).

49.    In Shortt's experience at York OCYF, it was typical the "clean query" would come back **<u>after</u>** the "present danger assessment" was done. (Exhibit 18, Shortt Depo., p. 27:23-25, p. 28:1-6) (emphasis added).

50.    In 2012, York OCYF's "present danger assessments" did not typically reflect the results of the "clean query" submitted by York OCYF.  (Exhibit 18, Shortt Depo., p. 28:1-6).

51.    The "present danger assessment," however, is supposed to consider the out of home caregiver's (i.e. Witmer's) criminal record. (Exhibit 17, Niemiec-Colin Depo., p. 42:2-4).

52.   York OCYF's caseworkers were trained that a criminal record check is to be done **before** the "present danger assessment," yet this was contrary to common practice in 2012. (Exhibit 17, Niemiec-Colin Depo., p. 42:5-8) (emphasis added).

53.   At that time, York OCYF "did not have the ability to immediately receive criminal records that we sent for" and it could take "anywhere from a day to three days."  (Exhibit 21, Almoney Depo., p. 53:16-24).

54.   However, York OCYF's caseworker training stated this regarding "present danger assessments:"

> Note: It is expected that a record check will have occurred to ascertain current and historical information about the criminal and CCYA background of the out-of-home care providers. Such information could reveal questions of suitability that preclude continuing the out-of-home care living arrangement or could require immediate observation and inquiry into the suitability of the home.

(*See* Exhibit 22) (Note: CCYA stands for "children and youth agency.")

55.   An erroneous "present danger assessment" (like Witmer's) was not changed after the fact at York OCYF.  (Exhibit 21, Almoney Depo., p. 55:7-10).

**York OCYF knew of Witmer's criminal history on November 16, 2012 but failed to account for Witmer's sex crimes in OCYF's safety assessments.**

56.   Shortt was unaware, but Ashley Rohrbaugh[3] completed the "clean query" on November 16, 2012, the first day Shortt went to Witmer's home.  (Exhibit 24, Witmer Criminal History Request Form).

---

[3] Ashley Rohrbaugh was the "intake supervisor" assigned to B.S.'s case.  (Exhibit 17, Niemiec-Colin Depo., p. 10).

57.    The results of Witmer's background check came back within an hour (Rohrbaugh faxed the request to York County Dept. of Emergency Services at 12:07 PM and it came back at 12:52 PM).  (Exhibit 24, Witmer Criminal History Request Form).

58.    The results of the request indicated Witmer's 1991 sex crime convictions and jail term (although not the 1989 convictions, for reasons unknown). (Exhibit 24, Witmer Criminal History Request Form).

59.    Rohrbaugh did not inform Shortt of Witmer's convictions.  (Exhibit 18, Shortt Depo., p. 22:9-11).

60.    York OCYF knew early in the intake process that Witmer had sex crimes related to children on his record.  (Exhibit 17, Niemiec-Colin Depo., p. 41:17-25, p. 42:1).

61.    Again, the "present danger assessment" Shortt completed is wrong, although the criminal history was available to Rohrbaugh and OCYF the day prior to Shortt signing the assessment.  (Exhibit 17, Niemiec-Colin Depo. p. 44:2-9; Exhibit 24, Witmer Criminal History Request Form).

62.    The present danger assessment, if done accurately, would have indicated B.S. was unsafe in Witmer's home,  (Exhibit 17, Niemiec-Colin Depo, p. 44:10-13), and indeed if anything "would be checked on the present danger as a yes as being a present safety threat, then a child shouldn't be left in that home.  You

wouldn't use them as an out-of-home caregiver." (Exhibit 20, Rohrbaugh Depo, p.

31:1-5) (emphasis added).

### York OCYF's "intake unit" did no investigation of Witmer's known criminal history, which was precisely their job.

63.     Here, Niemiec-Colin was the "intake caseworker" assigned to B.S.'s

case.  (Exhibit 17, Niemiec-Colin Depo., p. 10-12).

64.     Ashley Rohrbaugh was Niemiec-Colin's supervisor in intake during

B.S.'s case.  (Exhibit 17, Niemiec-Colin Depo., p. 10).

65.     As intake caseworker, Niemiec-Colin was tasked with the investigation

into the family, and after 60 days, the case would transfer to the family support unit.

(Exhibit 17, Niemiec-Colin Depo., p. 9:24-25, p. 10:1-3, p. 12:7-24).

66.     B.S.'s case transferred to the family support unit at York OCYF in the

summer of 2013.  (Exhibit 17, Niemiec-Colin Depo., p. 13:1-6).

67.     During an investigation, Niemiec-Colin was trained not to rely on what

out of home caregivers told her.  (Exhibit 17, Niemiec-Colin Depo., p. 21:1-11).

68.     Niemiec-Colin was trained to gather records regarding the family.

(Exhibit 17, Niemiec-Colin Depo., p. 21:20-22).

69.     In B.S.'s case, Niemiec-Colin gathered records, like police reports and

children and youth records, regarding criminal charges against B.S.'s father (I.S.)

and R.S.'s boyfriend Ryan Doerfler.  (Exhibit 17, Niemiec-Colin Depo., p. 45:7-21).

70.     Niemiec-Colin wanted to have context regarding the issues I.S. and Doerfler were having with the authorities.  (Exhibit 17, Niemiec-Colin Depo., p. 45:22-25).

71.     Niemiec-Colin, however, did not do any additional investigation or look for any additional records regarding Witmer's convictions beyond the initial clearance.  (Exhibit 17, Niemiec-Colin Depo., p. 44:14-21).

72.     Rohrbaugh, Niemiec-Colin's supervisor, did not recall discussing what led to Witmer's known 1991 conviction.  (Exhibit 20, Rohrbaugh Depo., p. 45:13-17).

**York OCYF continued to erroneously assess Witmer as "low risk" for abuse during intake.**

73.     During intake, in addition to the above-mentioned "present danger assessment," and non-existent "out-of-home safety assessment," Niemiec-Colin was supposed to complete a "risk assessment model" within the first 60 days.  (Exhibit 20, Rohrbaugh Depo, p. 32-33; Exhibit 25, Pennsylvania Model Risk Assessment Form).

74.     The "risk assessment model" was used in York OCYF's decision-making regarding B.S.'s case.  (Exhibit 20, Rohrbaugh Depo., p. 33).

75.     The "risk assessment model" is used to assess risk to children in each placement, and to look at "safety concerns or possible future risk" to the children (i.e. B.S.).  (Exhibit 21, Almoney Depo., p. 37:1-23).

76.     On the "risk assessment model," Witmer's "prior abuse history" and prior convictions are supposed to be assessed.  (Exhibit 20, Rohrbaugh Depo, p. 33-35).

77.     On the risk model, Niemiec-Colin indicated Witmer posed a "low risk" for abuse. (Exhibit 17, Niemiec-Colin Depo, p. 62:3-5; Exhibit 25, Pennsylvania Model Risk Assessment Form).

78.     However, given Mr. Witmer's two convictions, he should have been rated a "high risk" for abuse. (Exhibit 17, Niemiec-Colin Depo, p. 62:21-24).

79.     At the time of the risk assessment, Ashley Rohrbaugh knew of one prior allegation of a sexual nature with children against Witmer. (Exhibit 20, Rohrbaugh Depo, p. 41:1-15).

80.     Per the risk model, a prior sex crime conviction is an "automatic high risk" out of home caregiver; you "automatically start high risk and work your way down based on your consideration of the factors." (Exhibit 20, Rohrbaugh p. 42:1-17).

81.     The "risk assessment model" made no mention of Mr. Witmer's criminal history. (Exhibit 17, Niemiec-Colin Depo., p. 63).

82.     Rohrbaugh signed off on Niemiec-Colin's "risk assessment model." (Exhibit 25, Pennsylvania Model Risk Assessment Form).

83.     The "risk assessment model" was due on January 4, 2013, but Niemiec-Colin did not complete it until March 4, 2013, two months late; Rohrbaugh saw it for the first time in March 2013.  (Exhibit 20, Rohrbaugh Depo., p. 32-33).

**York OCYF determined Witmer was ineligible to serve as a kinship foster parent due to Witmer's sex crime convictions.**

84.     Early on, York OCYF recognized Witmer's home was ineligible to be a "kinship home" due to Witmer's criminal history.  (Exhibit 20, Rohrbaugh Depo, p. 24:2-8; Exhibit 17, Niemiec-Colin Depo., p. 56:9-22).

85.     Witmer could not qualify for "emergency caregiver or kinship" because Pennsylvania's Department of Human Services provides York OCYF a list of disqualifying criminal convictions, which applied to Witmer.  (Exhibit 21, Almoney Depo., p. 60:5-16) (Under 23 Pa.C.S. § 6344, no foster parent, including a kinship foster provider, can have a prior conviction for indecent assault or indecent exposure).

86.     Here, B.S. and his siblings resided with Witmer from November 16, 2012 forward under an "out of home safety plan" prior to OCYF taking legal custody. (Exhibit 20, Rohrbaugh Depo., p. 21-22).

87.     Shortt designed the safety plan, which called for B.S. and his siblings remaining at Mr. Witmer's house. (Exhibit 20, Rohrbaugh Depo., p. 21:6-25).

88.     Niemiec-Colin, as B.S.'s assigned caseworker, also testified she came up with the safety plan.  (Exhibit 17, Niemiec-Colin Depo., p. 48:1-17).

16

89.     Niemiec-Colin and Rohrbaugh, her supervisor, "became aware of the charge [and] would have considered that prior to putting the children there on a safety plan." (Exhibit 20, Rohrbaugh Depo., p. 43:6-13).

90.     York OCYF also considered B.S.'s placement a "Resource Family Kinship Home," because although Witmer was ineligible to be a kinship foster parent, "we would still see it as a kinship home, but they're not receiving payment for caring for the children because they can't go through the process." (Exhibit 26, Initial Child Permanency Plan; Exhibit 17, Niemiec-Colin Depo, p. 58:13-25, p. 59:1-8).

91.     Alternatively, York OCYF considered Witmer an "emergency caregiver" for the first 60 days, which is a designation for someone who has not yet qualified as a "kinship caregiver." (Exhibit 21, Almoney Depo., p. 18:20-24: Exhibit 20, Rohrbaugh Depo, p. 24-26).

92.     Witmer was precluded from serving as even an "emergency caregiver" given his known criminal conviction. (Exhibit 21, Almoney Depo., p. 60:5-16; Exhibit 27, PA DHS OCY Bulletin 3140-04-05/3490-04-01).[4]

**York OCYF elects to petition the York County Court of Common Pleas for custody in lieu of "kinship" placement.**

---

[4] OCY Bulletin 3140-04-05/3490-04-01 provides that an "emergency caregiver" must meet the same "clearance and home inspection requirements" as foster parents. Witmer did not meet the foster parent clearance requirements, which is undisputed.

93.     B.S.'s "safety plan" expired after 60 days, during which time York OCYF was unable to resolve B.S.'s custody situation, so York OCYF filed a dependency petition on January 8, 2013 with the York County Court seeking a custody transfer to York County and Witmer/Stough.  (Exhibit 21, Almoney Depo., p. 22-23; Exhibit 28, Dependency Petition).

94.     On January 8, 2013, the York County Court of Common Pleas temporarily transferred legal custody of B.S. to York OCYF, and physical custody to Witmer and Stough.  (Exhibit 29, Order of Temporary Custody).

95.     York OCYF recognized a custody transfer as an option for Witmer and B.S., because Witmer did "not need to be legally licensed as a kinship provider for that to happen."  (Exhibit 21, Almoney Depo., p. 61:1-17).

96.     York OCYF considered legal custody an alternative to kinship care for Witmer and B.S., as Witmer was legally prohibited from serving as B.S.'s kinship foster parent.  (Exhibit 21, Almoney Depo., p. 61-62).[5]

97.     York OCYF pursued custody in lieu of kinship care in situations where family members do not qualify for kinship.  (Exhibit 21, Almoney Depo., p. 61-62).

**York OCYF obtained custody of B.S. and then recommended Witmer be given custody.**

---

[5] York OCYF had a variety of options regarding B.S.'s care once he was taken from his mother, R.S., including kinship foster care, regular foster care, a group home, or a shelter.  (Exhibit 21, Almoney Depo., p. 18).

98.     On January 18, 2013, Judge Strong of York County's Court of Common Pleas held a hearing on York OCYF's application for emergency custody.  (Exhibit 30, Shelter Care Hearing Transcript).

99.     The January 18, 2013 hearing was the first hearing with a judge regarding placement of B.S.  (Exhibit 17, Niemiec-Colin Depo., p. 51:20-25).

100.    During the hearing, Niemiec-Colin disclosed to Judge Strong the fact of Witmer's 1990 charge, but provided no details regarding the 1990 incident, or the fact of Witmer's 1989 conviction (or the underlying details).  (Exhibit 30, Shelter Care Hearing Transcript; Exhibit 17, Niemiec-Colin Depo., p. 53-54).

101.    During the hearing, no one mentioned Witmer's present danger assessment, or any other risk/safety assessments.  (Exhibit 30, Shelter Care Hearing Transcript).

102.    If done accurately, the present danger assessment needed to be brought up in court.  (Exhibit 21, Almoney Depo., p. 26:12-25).

103.    York OCYF advocated for Witmer/Stough to maintain custody of B.S. (Exhibit 30, Shelter Care Hearing Transcript).

104.    Judge Strong decided she did not "find [Witmer] to be a threat of harm to the children, particularly in light of the fact that [R.S.] left the children in [Witmer's] care for a significant period of time." (Exhibit 30, Shelter Care Hearing Transcript).

105.   Judge Strong left the children in York OCYF's legal custody and Witmer/Stough's physical custody.  (Exhibit 31, Shelter Care Order).

**York OCYF's family support supervisor was confused regarding what kind of placement B.S. had with Witmer.**

106.   In 2013, B.S.'s case (and Witmer) transferred from the "intake unit" to the "family support unit," and away from Niemiec-Colin and Rohrbaugh to Nan Mavor, and her supervisor, Cathy Lyman.  (*See* Defendants' Statement of Facts, ¶ 48-49).

107.   When Cathy Lyman, York OCYF family support supervisor,[6] got the case, Lyman asked the person at York OCYF who handled "kinship" placements if the Witmer home was a "kinship home." (Exhibit 32, Lyman Depo., p. 14-15; Exhibit 33, June 30, 2013 E-mail).

108.   Lyman was "confused" whether the children should be in the "placement unit" or the "family support unit." (Exhibit 32, Lyman Depo., p. 15:19-22).

109.   Lyman learned B.S. was not in a "kinship home," because Witmer had a criminal history and because Witmer and Mary Ann Stough "would not have qualified on a number of different levels." (Exhibit 32, Lyman Depo, p. 16:15-25).

---

[6] Cathy Lyman worked for OCYF as a supervisor in the family preservation division in 2013, a unit previously known as the "family support unit." (Exhibit 32, Lyman Depo., p. 7:12-22).

110.   B.S.'s case was not the way York OCYF would typically handle things (i.e. the children would usually be in a kinship home).  (Exhibit 32, Lyman Depo., p. 17:7-11).

**York OCYF transferred full custody to Witmer/Stough and closed B.S.'s case.
R.S. then petitioned for custody.**

111.   Due, in part, to York OCYF's recommendations, on January 27, 2014 the York County Court of Common Pleas terminated OCYF's involvement and transferred full legal and physical custody of B.S. to Witmer and Stough.  (*See* Defendants' Statement of Facts, ¶ 70-76).

112.   Judge Strong's final January 27, 2014 order in the dependency proceedings also provided "[t]here shall be no transfer of custody of the minor child, [B.S.], without prior notification to York County Office of Children, Youth & Families…."  (Exhibit 34, Order for Termination of Court Supervision).

113.   In May 2014, R.S. filed a custody complaint in York County seeking custody of B.S.  (*See* Defendants' Statement of Facts, ¶ 79).

114.   In August 29, 2014, Judge Strong entered an agreed upon Order that maintained joint custody between Witmer/Stough and R.S., with custody gradually transferring to R.S.  (Exhibit 35, August 29, 2014 Order).

**York OCYF received a referral in 2016 regarding Witmer's alleged abuse of
B.S.; OCYF's caseworker determined B.S. was "placed at imminent risk of
abuse based on [Witmer's] past criminal history."**

115.   In 2016, York OCYF received a referral regarding Witmer's alleged inappropriate behavior with B.S.  (Exhibit 36, 2016 Report).

116.   The referral alleged Witmer was bathing B.S. and sleeping in the same bed as B.S.  (Exhibit 37, Singlinger Depo., p. 22:18-24).

117.   During the investigation, the assigned OCYF caseworker(s) discovered Witmer's past criminal history.  (Exhibit 37, Singlinger Depo., p. 25:1-24).

118.   The 2016 report was "validated" by OCYF.  (Exhibit 37, Singlinger Depo., p. 26:4-11).

119.   In York OCYF's report regarding the 2016 allegations against Witmer, OCYF employee Kevin Smedman wrote that "the children [B.S.] are placed at imminent risk of abuse based on the alleged perpetrator's [Witmer's] past criminal history."  (Exhibit 36, 2016 Report; Exhibit 37, Singlinger Depo., p. 30:1-15).

120.   Typically, when OCYF concludes children are at imminent risk, there will be a safety plan of some kind put in place.  (Exhibit 37, Singlinger Depo., p. 35:16-25).

121.   When OCYF has a validated report, there are multiple actions OCYF can take in response.  (Exhibit 37, Singlinger Depo., p. 36-37).

122.   Nothing, however, occurred after York OCYF's "validated" report regarding "imminent risk" posed by Witmer, because B.S. did not disclose any abuse at that time (2016).  (Exhibit 37, Singlinger Depo., p. 38:11-16).

**Witmer sexually abused B.S., is convicted, and goes to prison.**

123.   In 2017, pursuant to the August 2014 Order, Witmer still maintained joint custody of B.S.  (Exhibit 1, Witmer Depo., p. 86:1-22, p. 87:1-2).

124.   In 2017, during the periods Witmer had custody of B.S., Witmer sexually abused B.S. on multiple occasions.  (Exhibit 1, Witmer Depo., p. 94:4-25).[7]

125.   Witmer's abuse of B.S. was discovered, Witmer was charged, and he ultimately pled guilty to involuntary deviate sexual intercourse with a child (B.S.) and corruption of minors.  Witmer received a sentence of 10-15 years.  (Exhibit 38, Docket Sheet CP-67-CR-3392-2017).

Respectfully Submitted,

**ANDREOZZI & ASSOCIATES, P.C.**

Dated: December 10, 2019

*/s/ Benjamin D. Andreozzi*
Benjamin D. Andreozzi, Esq. (PA #89271)
ben@victimscivilattorneys.com

*/s/ Nathaniel L. Foote*
Nathaniel L. Foote, Esq. (PA #318998)
nate@victimscivilattorneys.com

111 North Front Street
Harrisburg, PA 17101
Ph: 717.525.9124 | Fax: 717.525.9143
*Attorneys for Plaintiff*

---

[7] Witmer's sexual contact with B.S. consisted of showing B.S. pornographic videos and magazines, oral sex, and manual stimulation.  (Exhibit 1, Witmer Depo., p. 94-96).  Witmer was caught when B.S. set up a phone to record Witmer performing oral sex on B.S., which B.S.'s sister watched in real-time from another room.  *Id.*

<u>**CERTIFICATE OF SERVICE**</u>

I, Nathaniel L. Foote, Esq., counsel for Plaintiff, hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via this Court's electronic filing system.

David J. Freedman, Esq.
*dfreedman@barley.com*
Lindsey Cook, Esq.
*lcook@barely.com*
126 East King Street
Lancaster, PA 17602
Tel: (717)299-5201
Fax: (717) 291-4660
Attorneys for Defendants


Respectfully Submitted,

**ANDREOZZI & ASSOCIATES, P.C.**

Dated: December 10, 2019 <u>/s/ Nathaniel L. Foote, Esq.</u> (PA ID 318998)
nate@victimscivilattorneys.com
111 N. Front Street, Harrisburg, PA  17101
Ph: 717.525.9124 | Fax: 717.525.9143