## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| B.S., a minor, by NATALIE M.R. BURSTON, guardian ad litem, | : | Civil No. 1:17-CV-01789 |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YORK COUNTY, NAN MAVOR, CATHY LYMAN, JACY NIEMIEC a/k/a Jacy Colin, and ASHLEY ROHRBAUGH, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

In this case, Plaintiff, B.S., a minor, pursues claims in his amended complaint under 42 U.S.C. § 1983, through his guardian ad litem. B.S. names as Defendants, York County, as well as individual caseworkers and supervisors with the York County Office of Children, Youth, and Families.

Generally, according to B.S., Defendants deprived him of his substantive due process right to bodily integrity and to be free from bodily harm when he was sexually abused in 2017 by his step-grandfather, Ronald Witmer ("Witmer"). Approximately four years before the abuse began, Witmer had obtained custody of B.S. despite his prior child-sex-abuse convictions from 1989 and 1991. B.S. seeks to hold Defendants liable due to certain assessments and placement decisions that were made, which, in B.S.'s view, led a state-court judge to award Witmer partial custody and, ultimately, to B.S. suffering sexual abuse. Because the harm B.S.

1

tragically endured flowed from the reprehensible acts of Witmer, a private citizen, B.S. premises his constitutional claims against Defendants on the special-relationship and state-created danger theories of liability.

Pending before the court is a motion for summary judgment filed by the remaining Defendants: York County, Jacy Niemiec a/k/a Jacy Colin ("Colin"), and Ashley Rohrbaugh ("Rohrbaugh").  With respect to that motion, the court initially disagrees with the remaining Defendants that the court lacks subject-matter jurisdiction under the *Rooker-Feldman* doctrine.   B.S. does not complain of injuries caused by a state-court decision.  Nor is B.S. inviting this court to review and reject a state-court decision.  The court, though, will ultimately grant the motion.

To that end, the court agrees that Colin and Rohrbaugh are entitled to absolute immunity to a specific degree, and that collateral estoppel precludes B.S. from relitigating the issue of the danger that Witmer posed to him based on the prior convictions.  Furthermore, on the merits, although this case, like many others like it, involves unsettling facts, the court, viewing the record evidence in B.S.'s favor, determines that no reasonable juror could find that the remaining Defendants violated B.S.'s constitutional rights, whether under the special-relationship or state-created-danger theory of liability.

That is because no special relationship existed with the remaining Defendants when Witmer abused B.S. in 2017.  Furthermore, four years lapsed between the relevant acts of the remaining Defendants and Witmer's abuse.  Also, several intervening events further disconnect the remaining Defendants' acts from the abuse.  Based on these facts, which are undisputed, the remaining Defendants did not create a danger to B.S.  And because B.S. cannot establish any constitutional violation, no reasonable juror could find for B.S. on the § 1983 claim against York County, under *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Accordingly, as discussed in more detail below, the court will grant the remaining Defendants' motion and enter judgment for the remaining Defendants on Counts I–III.

## FACTUAL BACKGROUND[1]

### A.    Witmer, B.S.'s Paternal Step-Grandfather, Was Convicted Of Multiple Crimes Involving The Sexual Abuse Of Minors

B.S. and Witmer's paths crossed  because Witmer married B.S.'s paternal grandmother, Mary Anne Stough ("Stough").  (*See generally* Doc. 54, ¶ 8.)  At that point, Witmer became B.S.'s paternal step-grandfather.  (*See* Doc. 61-1, p. 12.)[2]

---

[1] In this section, the court relates disputed and undisputed facts.  When the court relates disputed facts, it does so consistent with the standard of review, *infra*.

[2] Where appropriate and for ease of reference, the court utilizes the page numbers from the CM/ECF header.

Before Witmer entered B.S.'s family, however, Witmer had a terribly troubled past.

In or around 1984, while a junior in high school, Witmer joined the United States Army.  (*Id.* at 6.)  In 1987 or 1988, Witmer was discharged from the Army and moved back to York County, Pennsylvania.  (*Id.* at 8.)  Shortly after Witmer returned to York, on March 3, 1989, police received a report that Witmer had sexually abused a minor ("C.S."), who was four years old.  (Doc. 61-2, p. 2.) Witmer and C.S. were related as cousins.  (*Id.* at 2; *see* Doc. 61-1, p. 9.)

Within days, the police notified the York County Office of Children, Youth, and Families ("York County CYF") about the allegations against Witmer.  (Doc. 61-3, p. 2.)  York County CYF is operated by Defendant York County, and part of its mission is to protect children from sexual victimization.  (Doc. 42, ¶¶ 3–4; Doc. 48, ¶¶ 3–4.)

On March 18, 1989, police interviewed Witmer.  (*See* Doc. 61-2, pp. 3–4.) During the interview, Witmer admitted that he "held [C.S.'s] penis in his hand . . . for about a minute" and "squeezed his genitals . . . several times in his hand."  (*Id.* at 3.)  Afterwards, Witmer was charged with and eventually pleaded guilty to two misdemeanors: indecent assault and corruption of minors.  (Doc. 61-1, p. 9; *see* Doc. 61-4; Doc. 61-5.)

Just one-and-a-half years after Witmer pleaded guilty in the C.S. case, a 12-year-old boy ("T.R.") and his parents reported Witmer for (1) exposing himself to T.R. and another minor boy, and (2) forcing the children to expose themselves to him.  (Doc. 61-6, p. 2.)  Like before, York County CYF was notified of the allegations against Witmer.  (*See* Doc. 61-7.)

In 1991, Witmer pleaded guilty to two additional misdemeanors: indecent exposure and corruption of minors.  (Doc. 61-1, p. 10; *see* Doc. 61-8; Doc. 61-9.)  Based on his 1991 guilty plea in the T.R. case, Witmer served six months in county jail.  (Doc. 61-1, p. 11.)

**B.    B.S.'s Life Leading Up To November 2012**

B.S. was born in 2004.  (Doc. 54, ¶ 5.)  B.S. is the oldest of three children born to his mother ("R.S.") and father.  (*Id.* ¶ 6.)  The children's parents divorced in 2010.  (*Id.* ¶ 9.)  Afterwards, R.S. assumed primary custody.  (*Id.* ¶ 10.)

In the Summer of 2010, sometime following the divorce, B.S. and his siblings visited their father in Massachusetts, where he was living at the time.  (*Id.* ¶ 11.)  During their visit, the father physically abused the children, withheld food from them, and would not permit them to engage in any activity other than watching television.  (*Id.* ¶ 12.)  Eventually, the father pleaded guilty to child-abuse charges.

Two years later, in the Fall of 2012, B.S.'s younger brother, I.S., told his

schoolteacher that B.S. and their sister, E.S., were forced by R.S. to take nude

photos of her.  (*Id.* ¶ 14.)  Around that time, Stough and Witmer kicked R.S. out of

their residence (the "Stough / Witmer residence"), where the children and R.S. had

occasionally resided during the previous five years.  (*See id.* ¶ 15; Doc. 54-11, p. 4;

Doc. 57, ¶ 7.)  When R.S. moved out in the Fall of 2012, she left the children with

Stough and Witmer.  (Doc. 54, ¶ 16.)

### C.    York County CYF Becomes Involved With B.S. And His Family

Around November 9, 2012, not long after R.S. moved out of the Stough /

Witmer residence, R.S. picked up the children and took them to live in an

apartment with her and her paramour, Ryan Doerfler ("Doerfler").  (Doc. 54, ¶¶ 7,

17.)  Within a week, on or about November 16, 2012, a neighbor reported Doerfler

and R.S. to York County CYF. (*Id.* ¶ 18; *see* Doc. 42, ¶¶ 11, 32; Doc. 48, ¶¶ 11,

32.)  According to the neighbor, Doerfler had hit the children with a wooden board

on their buttocks causing minor injuries.  (*See* Doc. 54-11, p. 4.)  Doerfler also

allegedly grabbed one of the children by the neck, while attempting to strangle

him.  (*See id.* at 4.)

On the same day that the neighbor made the report, a caseworker from York

County CYF, Tess Shortt ("Shortt"), met with the children at their school.  (Doc.

54, ¶ 20; *see* Doc. 42, ¶ 33; Doc. 48, ¶ 33.)  During the meeting, the children told

Shortt that Doerfler had abused them and that they feared him.  (*See* Doc. 54, ¶

20.)  The children also told Shortt that they felt safe with Witmer and Stough.

(Doc. 61-18, p. 5.)

At some point during or after Shortt's meeting with the children, someone

from the children's school called the Stough / Witmer residence to ask if someone

from the residence could pick them up.  (*See* Doc. 61-1, p. 14.)  In response,

Witmer, who had never considered trying to get custody, went to the school before

the end of the school day and picked up the children.  (*Id.* at 14, 23.)  As of that

date –November 16, 2012 – the children again lived with Stough and Witmer.

(Doc. 54-4, p. 4.)[3]

---

[3] In requests for admission, Defendants asked B.S. to admit that "R.S. returned [him] to the Stough / Witmer household within approximately two weeks after removing [him] from the home in November 2012."  (Doc. 54-4, p. 4.)  B.S. unequivocally and without qualification "admitted" the request.  (*Id.*)  Under Federal Rule of Civil Procedure 36(b), the admission "is [a] conclusively established [fact] unless the court, on motion, permits the admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b).  To date, B.S. has not moved to withdraw or amend this admission.  Nor does the court construe any part of B.S.'s response to the pending summary-judgment motion to make such a request.  The admission, therefore, remains a conclusively established fact that cannot be assailed by conflicting evidence.  *See Airco Indus. Gases, Inc. Div. of the BOC Group, Inc. v. Teamsters Health & Welfare Pension Fund of Phila. & Vicinity*, 850 F.2d 1028, 1036–37 (3d Cir. 1988) ("[E]ven if the Fund could point to conflicting testimonial evidence, the failure of the Fund to withdraw or amend [its] admission prior to trial would, according to the first sentence of Rule 36(b), operate to waive any objection to the truth of [the admission's] contents.")  At the same time, the request for admission is ambiguous with respect to the date on which B.S. admitted that R.S. returned him to the Stough / Witmer residence.  Given this ambiguity, coupled with the standard of review on a motion for summary judgment, *infra*, the court declines to treat B.S.'s admission as conclusively establishing that R.S. returned him to the Stough / Witmer residence on November 16, 2012.

### D. York County CYF Performs Assessments And Develops A Safety Plan

After Witmer picked up the children, Shortt went to the Stough / Witmer residence.  (*See* Doc. 61-18, p. 6.)  While there, Shortt asked Stough and Witmer whether they had any criminal convictions.  (*See* Doc. 42, ¶ 36; Doc. 48, ¶ 36.) Witmer answered that he did not.  (*Id.* ¶ 36.)  Unbeknownst to Shortt at the time, Witmer's answer was a lie.  (*See id.* ¶¶ 37, 40.)

### 1. Shortt Completes A Present Danger Assessment

On November 17, 2012, Shortt returned to the Stough / Witmer residence. (Doc. 61-18, p. 6.)  Shortt then completed a "Present Danger Assessment" and signed an Assessment Form with respect to Witmer as an out-of-home caregiver. (Doc. 61-19.)

A "Present Danger Assessment" is performed by York County CYF, in the context of "out-of-home" placements.  (Doc. 61-18, p. 8; *see* Doc. 61-19.) Rohrbaugh, a York County CYF supervisor who would serve as the intake supervisor on B.S.'s case, *see* Doc. 61-17, p. 5, described the assessment as part of the intake process that is used to check on the "out-of-home caregiver to see if there's an immediate threat of harm to the child's safety in that moment that would prevent them from being placed there."  (Doc. 61-20, p. 10.)  Indeed, the assessment documents "easily observable [present] danger[] [threats]."  (*See* Doc. 61-19; 61-21, p. 10.)

On the assessment form regarding Witmer, which was completed and signed by Shortt on November 17, 2012, Witmer was clearly identified as an out-of-home caregiver.  (Doc. 61-19, p. 2.)  The assessment form further included inquiries related to whether Witmer had "previously maltreated a child" such that "the severity of the maltreatment or [Witmer's] response to the previous incident(s) suggest[ed] that safety may be an immediate concern."  (*Id.* at 2.)  As well, the form included an inquiry into whether Witmer had a history of criminal behavior "that affects child safety, such as . . . sex crimes . . . ."  (*Id.* at 2.)  Despite the importance of accuracy to inform the intake process, Shortt marked "No" for both inquiries on the form.  (*Id.* at 2; *see* Doc. 61-21, p. 11.)

A "Yes" response on any of the inquiries would have indicated "that [the Stough / Witmer residence] may not [have] be[en] an appropriate placement for the child[ren]."  (Doc. 61-21, p. 10.)  In fact, according to Rohrbaugh, if a "Yes" response was ever indicated, "a child shouldn't be left in th[e] home" being investigated.  (Doc. 61-20, p. 10.)  "You wouldn't use the[] [person being assessed] as an out-of-home caregiver."  (*Id.* at 10.)

With respect to the "No" responses, no one had told Shortt about Witmer's criminal history.  (*See* Doc. 61-18, p. 8.)  Shortt, moreover, did not look up Witmer's criminal records.  (*See* Doc. 42, ¶ 45; Doc. 48, ¶ 45.)  At the time, Shortt understood that it would take a "couple days" to obtain a "clean query" (i.e.,

9

background check) on someone.  (*See* Doc. 61-18, p. 9; *see also* Doc. 61-21, p. 15.)  Furthermore, despite their training, in Shortt's experience, it was typical that intake caseworkers would complete the Present Danger Assessment before receiving a background check.  (Doc. 61-18, p. 9; *see* Doc. 61-17, p. 13; Doc. 61-22, p. 3.)  Thus, in 2012, even though a Present Danger Assessment was supposed to consider the out-of-home caregiver's criminal record, York County CYF's Present Danger Assessments – like the one Shortt prepared on Witmer – did not always reflect that information.  (*See* Doc. 61-17, 12-14; 61-18, p. 9.)

On November 16, 2012, while Shortt was unaware of Witmer's criminal history, Rohrbaugh had learned about one of his convictions.  On that date, Rohrbaugh requested Witmer's criminal history.  (Doc. 42, ¶ 41; Doc. 48, ¶ 41.)  And, though seemingly out of the norm, the same day that she made the request, Rohrbaugh received the results of Witmer's criminal history.  (*Id.* ¶ 43; *see* Doc. 61-24.)

The results revealed Witmer's 1991 conviction in the T.R. case, but not his 1989 conviction in the C.S. case.  (Doc. 61-24, p. 9–10; *see* Doc. 42, ¶ 44; Doc. 48, ¶ 44.)  Even so, Rohrbaugh did not inform Shortt about Witmer's 1991 conviction prior to when she completed the Present Danger Assessment.  (*See* Doc. 61-18, pp. 7–8.)  And, thus, because Shortt was unaware of Witmer's convictions, she did not

accurately complete the Assessment form.  (*See* Doc. 61-19, p. 2.)  The children remained with Stough and Witmer.

What is more, York County CYF would then skip a step in the intake process by failing to complete an out-of-home safety assessment.  (*See* Doc. 61-21, p. 9; 61-23.)  That particular assessment, if performed, would have stood to correct the incorrect Present Danger Assessment which Shortt completed and signed.  (*See* Doc. 61-21, p. 16.)

### 2.   Colin Assists With The Development Of A Safety Plan

Shortt's involvement with B.S.'s case was brief.  After Shortt, Colin took over as the intake caseworker.  (Doc. 42, ¶ 64; Doc. 48, ¶ 64.)  Rohrbaugh supervised Colin.  (*Id.* ¶ 65.)

Colin was involved with the development of a safety plan for the children, which Shortt had initiated before her time on the case ended.   (Doc. 61-20, p. 7; *see* Doc. 54, ¶ 22; Doc. 61-17, p. 14.)  A safety plan is a voluntary agreement of a parent regarding a temporary-custody placement needed to resolve an immediate safety concern.  (Doc. 54, ¶ 23.)  Under the safety plan, the children were to temporarily remain at the Stough / Witmer residence.  (Doc. 61-20, p. 7; *see* Doc. 54, ¶ 24.)  Before she disappeared for several weeks, R.S. agreed to the safety plan. (Doc. 54, ¶¶ 24–25.)

### 3.  Colin Investigates Suitability Of Witmer As Kinship Care Provider

"In the November / December 2012 timeframe," Colin also investigated whether York County CYF could name Stough and Witmer as so-called "Kinship Care Providers," entitled to payment in exchange for caring for the children.  (Doc. 54, ¶ 26.)  Colin was trained not to rely on what out-of-home caregivers told her during such investigations.  (Doc. 61-17, p. 7.)  She was also trained to gather records with regard to the family involved with the investigation.  (*Id.*)

In B.S.'s case, Colin gathered records regarding criminal charges against B.S.'s father and Doerfler.  (Doc. 61-17, p. 13.)  But with respect to Witmer, Colin did not look for additional records beyond "the [child abuse] clearance," which would not have reflected his convictions because, at some point, they were expunged.  (*Id.*; Doc. 61-20, p. 11.)  Nevertheless, York County CYF apparently had knowledge of at least one of Witmer's convictions given that York County CYF would not advocate for Witmer to serve as a kinship provider.  (*See generally* Doc. 54-13, p. 69; *see also* Doc. 61-21, p. 17.)  In that vein, Pennsylvania law precluded Witmer from serving as a Kinship Care Provider because of his convictions.  (Doc. 54, ¶ 29 (citing 23 Pa. C.S.A. § 6344(a), (c)(2).)

### 4.  Colin Completes A Risk Assessment Model

Colin was further tasked with completing a Risk Assessment Model.  (*See* Doc. 61-20, pp. 10–11; *see also* Doc. 61-25.)  In general, the models assess risk to children in each placement and look at "safety concerns" or "possible future risk" posed to the children.  (Doc. 61-21, p. 11.)  The written Risk Assessment Model in B.S.'s case was to be completed by January 4, 2013.  (*See* Doc. 61-20, p. 10; Doc. 61-25.)  Colin, however, did not complete the written model until two months later in the process – March 4, 2013.  (*See id.*)  At the same time, Rohrbaugh and Colin likely would have discussed information related to the written Risk Assessment Model before completing a permanency plan.  (*See* Doc. 61-20, pp. 10–11.)

Accordingly, as reflected on the written Risk Assessment Model that Colin eventually completed and Rohrbaugh signed, they would have discussed Witmer's "prior abuse history" and prior convictions.  (*Id.* at 11; *see* Doc. 61-25, p. 2.)  The actual written Risk Assessment Model, though, identified Witmer as a "low risk" for abuse and did not mention his criminal history.  (Doc. 61-25, p. 2, 4–7.)

Colin testified that, with two convictions, she should have identified Witmer as "high risk."  (Doc. 61-17, p. 18.)  Rohrbaugh, however, explained that, with a sex-abuse conviction, the default is "high risk" for abuse, but other factors can be considered resulting in a low risk indicator.  (*See* Doc. 61-20, pp. 11–13.)  Among the other factors that could be considered were the length of time between

incidents and the nature of the incidents. (*Id.* at 11.) However, specifically regarding Witmer and the model that Colin eventually completed, Rohrbaugh did not know what factors were taken into consideration to indicate that Witmer was "low risk" for abuse. (*Id.*)

### E.   York County CYF Applies For Emergency Protective Custody

On January 8, 2013, despite Witmer's convictions disqualifying him as a kinship provider, and because the safety plan was set to expire without resolution of the children's custody situation, York County CYF filed an emergency application. (Doc. 54, ¶ 31; *see* Doc. 61-21, p. 8.) Through the application, York County CYF sought to place the children with Stough and Witmer on an emergency basis. (*Id.*) That same day, the Honorable Andrea Marcea Strong of the Court of Common Pleas for York County, Pennsylvania entered an order awarding temporary legal custody to York County CYF and temporary physical custody to Stough and Witmer. (Doc. 61-29.) Judge Strong further scheduled a protective custody hearing and appointed Daniel Worley, Esquire as B.S.'s guardian ad litem. (*Id.*)

Ten days later, on January 18, 2013, Judge Strong held the protective custody hearing. (Doc. 54, ¶ 32.) In addition to representatives from York County CYF, the following individuals participated: R.S. and her attorney; the children's father (by telephone); and Attorney Worley. (*Id.* ¶¶ 33–34.)

During the hearing, Colin testified that Witmer had been convicted of "indecent exposure and corruption of minors in 1990," but that there had been no reports of anything since. (Doc. 54-13, pp. 29–30.) York County CYF also informed Judge Strong that it "did not have an issue with [Witmer's conviction] . . . because it was so old." (Doc. 54, ¶ 36.) Attorney Worley, moreover, agreed with York County CYF that the children should remain with Stough and Witmer. (*Id.* ¶ 37.) According to Attorney Worley, the children were "clear" that "they want[ed] to stay" at the Stough / Witmer residence. (*Id.* ¶ 30.)

When R.S.'s attorney cross-examined Colin about whether York County CYF had conducted a threat-of-harm evaluation – also known as a 5329 evaluation – Judge Strong interrupted the questioning. (*Id.* ¶ 38.) Judge Strong stated that "[w]e don't do 5329 evaluations." (*Id.*) She further expressed that "since there's been no other reports or incidents in the last 23 years, that I don't find him to be a threat of harm to the children[.]" (*Id.*) Judge Strong also made that particular finding based on "the fact that [R.S.] left the children in [Witmer's] care for a significant period of time." (*Id.*)

In the end, Judge Strong found sufficient evidence to support placing the children in York County CYF's legal custody and Stough and Witmer's physical custody. (Doc. 54, ¶ 39; Doc. 61-31, p. 3.) To reach that decision, Judge Strong acknowledged that the children preferred to remain with Stough and Witmer, and

had been living with them for at least two years in the past.  (Doc. 54, ¶ 40.)  Judge Strong further acknowledged that Attorney Worley supported placing the children with Stough and Witmer.  (*Id.*)

### F.    York County CYF Files A Dependency Petition

Not long after the hearing on York County CYF's emergency petition, on February 8, 2013, York County CYF filed dependency petitions on behalf of the children.  (Doc. 54, ¶ 41.)  And on March 15, 2013, Judge Strong presided over a hearing.  (*Id.* ¶ 42.)

During the hearing, York County CYF, R.S., and Attorney Worley agreed that the children should be declared dependent.  (*Id.* ¶ 43.)  The same parties also agreed that the children should remain in the physical and legal custody of Stough and Witmer, with the hope that the children could be reunited with R.S.  (*Id.* ¶¶ 44–45.)

At the end of the hearing, Judge Strong determined that it was in the best interests of the children that they be "removed" from their parents' homes, that the children were "safe in their current placement," and that Witmer and Stough were "fit and willing relatives."  (*Id.* ¶ 46.)  In other words, she declared the children dependent.  Judge Strong also provided R.S. with limited visitation rights and ordered the children and R.S. to participate in family therapy with the goal of being reunified within six months.  (*Id.* ¶ 47.)

### G.     York County CYF Makes Findings On Allegations Against R.S.

On April 2, 2013, York County CYF found credible the allegations that R.S. had forced B.S. and E.S. to take nude photographs of her.  (Doc. 54, ¶ 51.)  R.S. also resisted completing the therapy required as a condition for reunification with her children and, while continuing to reside with him, refused to admit that Doerfler abused the children.  (*Id.* ¶¶ 52–54.)

### H.     York County CYF Transitions Roles

 Colin's role in the case ended in summer 2013, after Judge Strong had already found the children "dependent."  (*See* Doc. 54, ¶¶ 48–49.)  Defendant Nan Mavor ("Mavor"), a caseworker in the family support unit (who has been dismissed from this action via stipulation), took over the case.  Mavor was supervised by Defendant Cathy Lyman ("Lyman") (who was also dismissed pursuant to the same stipulation).  Mavor and Lyman were tasked with monitoring the children during placement.  (Doc. 54, ¶ 49; *see* Doc. 54-2, p. 5; Doc. 54-17, p. 3.)

When Lyman first got the case, she contacted a supervisor in York County CYF's "placement unit."  (Doc. 61-32, p. 6; Doc. 61-33.)  Lyman was "confused" about whether the Stough / Witmer residence was a "kinship home."  (Doc. 61-32, p. 6; *see* Doc. 61-33.)  To that end, Lyman understood that "normally if children are placed in a relative['s] home . . . and the goal is reunification with a parent,

then they are considered in placement through a kinship process[.]" (Doc. 61-32, p. 6.)  In turn, according to Lyman, the placement unit, not the family support unit, would handle the case monitoring.  (*See id.*)  But that was not the situation in B.S.'s case, which "was not the way that, generally speaking, it would go."  (*Id.*)

Lyman, though, would learn that Witmer's criminal history precluded the residence from qualifying as a kinship home.  (*Id.*)  She further perceived that, "on a number of different levels," Stough and Witmer would not have a qualified anyways.  (*Id.*)

### I.  R.S. Wants The Children To Live With Her, And Mavor Conducts Site Visits

At points throughout 2013, the children refused to speak with R.S.  (Doc. 54, ¶ 58.)  But that did not deter R.S., who continued to deny that Doerfler abused the children even after his arrest for child abuse.  (*Id.* ¶¶ 55, 57.)  R.S. wanted the children to live with her at her father's home.  (*Id.* ¶ 60.)

An August 2013 site visit of R.S. father's home, however, revealed unsafe conditions due to unsecured medicine and medical equipment.  (*Id.* ¶ 60.)  Stough and Witmer on the other hand had complied with all requirements while the children lived under their care in 2013.  (*Id.* ¶ 61.)   And during monthly site visits to the Stough / Witmer residence, Mavor did not note any concerns with the children's placement.  (*Id.* ¶ 62.)  Nor did the children report any abuse to Mavor.

(*Id.*)  In fact, B.S. admits that no abuse occurred while living with Stough and Witmer from November 2012 until January 2017.  (*Id.* ¶ 63; Doc. 57, ¶ 63.)

### J.  Judge Strong Holds Status Hearings In 2013

Throughout 2013, Judge Strong held three status hearings.  (Doc. 54, ¶¶ 64–66.)  At each hearing, Judge Strong evaluated the children's safety remaining with Stough and Witmer.  (*Id.* ¶ 67.)  Judge Strong also evaluated whether the children could return to R.S.'s custody or should be placed with someone else.  (*Id.*)  At each hearing, Judge Strong found that the children were safe and that continuing to live with Stough and Witmer was in the best interests of the children.  (*Id.* ¶ 68.)

What is more, at the third status hearing in November 2013, Attorney Worley brought up the issue of performing a threat-of-harm evaluation for Witmer, indicating that Witmer was willing to undergo such an evaluation.  (*Id.* ¶ 69.)  Judge Strong responded that the court had already determined that Witmer's past criminal convictions (from 1989 and 1991) did not "indicate that he would possess a threat of harm to the children."  (*Id.*)

### K.  Judge Strong Terminates The Dependency Proceedings And York County CYF's Involvement With B.S.'s Family

On January 14, 2014, York County CYF submitted a report to Judge Strong on the family's situation.  (Doc. 54, ¶ 70.)  In the report, York County CYF noted that Mavor and a family advocate from Catholic Charities found R.S.'s reunification efforts unsatisfactory.  (*Id.* ¶ 71.)  York County CYF also

recommended that the court permit the children to remain in Stough and Witmer's custody and terminate York County CYF's involvement with the family.  (*Id.* ¶ 72.)  The court-appointed special advocate and Attorney Worley agreed with York County CYF's recommendations.  (*Id.* ¶¶ 73–74.)  In addition, the children requested to remain with Stough and Witmer.  (*Id.* ¶ 75.)

On January 27, 2014, Judge Strong issued an order for termination of court supervision.  In the order, Judge Strong terminated the dependency proceedings and York County CYF's involvement with the family.  (*Id.* ¶ 76.)  Judge Strong also transferred legal and physical custody of the children to Stough and Witmer, finding that the children were "safe" and Stough and Witmer were "fit and willing relatives."  (Doc. 54, ¶¶ 76–77.)  With respect to Witmer, Judge Strong "reaffirm[ed] [her] previous finding that . . . Witmer d[id] not pose a threat of harm" to B.S.  (Doc. 61-34, p. 3.)  Finally, Judge Strong ordered that future custody of the children could not be transferred "without prior notification to [York County CYF]" and a court order.  (*Id.*)

Notably, while B.S. was in York County CYF's protective custody prior to the January 24th order, he admits that he did not suffer any abuse by Witmer.  (Doc. 54, ¶ 78; Doc. 57, ¶ 78.)

### L.     R.S. Files A Custody Complaint

In May 2014, five months after Judge Strong issued her order terminating York County CYF's involvement with the family, R.S. filed a complaint seeking custody of her children.  (Doc. 54, ¶ 79.)  R.S. did not name York County CYF as a party.  (Doc. 54-27.)  The court is also unaware of any evidence that York County CYF participated in R.S.'s action.

On June 9, 2014, Judge Strong issued an interim order, in which she continued legal and primary physical custody with Stough and Witmer.  (Doc. 54-28, p. 5.)  Judge Strong, moreover, highlighted her "previous finding that . . . Witmer does not pose a threat to [B.S.]."  (*Id.* at 13.)

Ultimately, R.S. came to an agreement with Attorney Worley, Stough, and Witmer on a process to transfer custody gradually back to her.  (Doc. 54, ¶ 82.)  In the meantime, Stough and Witmer would maintain legal custody over the children, as well as primary physical custody, subject to certain rights provided to R.S.  (*See* Doc. 61-35.)

### M.     In 2016, York County CYF Receives Allegations About Witmer That Involved B.S.

In February 2016, York County CYF received a referral involving allegations that Witmer was bathing and sleeping in the same bed with B.S. and I.S.  (Doc. 61-36; *see* Doc. 61-37, p. 8.)  During the investigation into those allegations, the assigned caseworker discovered Witmer's past criminal history.

(*See* Doc. 61-37, pp. 8–9.)  "[B]ased on [Witmer's] past," York County CYF

ultimately "validated" the allegations.  (Doc. 61-36, p. 25.)  York County CYF,

however, noted that "there [was] no disclosure of recent abuse and[, thus,] no way

for the agency to intervene at th[at] time."  (*Id.*)  At the same time, York County

CYF further expressed that, "based on Witmer's past criminal history," the

"children [we]re placed at imminent risk of abuse . . . ."  (*Id.*)  But rather than

intervene and enact a safety plan, which it had the option of doing, *see* Doc. 61-37,

p. 11, York County CYF took no action.

### N.    In 2017, Witmer Sexually Abuses B.S.

By the beginning of 2017, the children were mostly living with R.S.  (Doc.

54, ¶ 83.)  The children, however, regularly visited the Stough / Witmer residence.

(*Id.*)  Indeed, Stough and Witmer still maintained joint custody of the children via

Judge Strong's order issued in the custody matter that R.S. had filed.  (*See* Doc.

61-1, p. 23.)

During a visit in January 2017, Witmer began sexually abusing B.S., and

continued to horribly sexually abuse B.S. through April 2017.  (Doc. 54, ¶ 84; Doc.

61-1, pp. 25–26.)  In April 2017, R.S. discovered the abuse (after Witmer had been

caught by B.S.'s sister) and reported Witmer to the police.  (Doc. 54, ¶ 85; *see*

Doc. 61-1, pp. 25–26.)  Witmer, who is presently serving a 10 to 15-year sentence

of imprisonment, pleaded guilty to abusing B.S.  Specifically, Witmer pleaded

guilty to involuntary deviate sexual intercourse with a child and corruption of minors.  (Doc. 54, ¶ 86.)

## PROCEDURAL HISTORY

On October 3, 2017, B.S. initiated this action by filing a complaint.  (Doc. 1.)  Thereafter, the court appointed a guardian ad litem for B.S.  (Doc. 11.)  This action currently proceeds by means of B.S.'s amended complaint.  (Doc. 42.)  In the amended complaint, B.S. names York County as a Defendant.  (Doc. 42, ¶ 3.)  B.S. also names Colin, Mavor, Lyman, and Rohrbaugh as Defendants, suing them in their individual and official capacities.  (*Id.* ¶¶ 5–8.)

In Counts I and II, B.S. claims under 42 U.S.C. § 1983 that Defendants deprived him of his Fourteenth Amendment right to be free from sexual abuse, in violation of the state-created-danger and special-relationship theories of liability.  (*Id.* ¶¶ 107–25; *see* Doc. 66, p. 23.)  B.S. also asserts a claim in Count III against York County under *Monell*.  There, B.S. alleges that certain "municipal customs" operated as "the moving force" behind his constitutional injury.  (Doc. 42, ¶¶ 126–28.)  For remedies, B.S. requests damages, attorneys' fees, and costs.  (*Id.* at 17, 19, 20.)

On August 19, 2019, Defendants answered the amended complaint, and then filed an amended answer on August 22, 2019.  (Docs. 46, 48.)  In the amended answer, Defendants assert affirmative defenses, including defenses under the

doctrines of absolute and qualified immunity, collateral estoppel, and *Rooker-Feldman*.  (*See* Doc. 48, pp. 23–25.)

On November 14, 2019, after the close of fact discovery on liability, *see* Doc. 41, the parties stipulated to the voluntary dismissal, with prejudice, of Mavor and Lyman.  (Doc. 50.)  The court has since approved the joint stipulation.  (Doc. 68.)  Also, on November 19, 2019, the remaining Defendants – York County, Colin, and Rohrbaugh – timely filed the pending motion for summary judgment on the issue of liability.  (Doc. 52; *see* Doc. 41.)

Along with their motion, the remaining Defendants filed a brief in support, a statement of facts, and supporting documentation.  (*See* Docs. 53–54.)  B.S. timely responded to the motion by filing a brief in opposition, an answer to the remaining Defendants' statement of facts, a counterstatement of facts, and supporting documentation.  (*See* Docs. 57–58, 60–61, 65–66.)  Thereafter, on August 6, 2020, the remaining Defendants filed a reply brief.  (Doc. 67.)  The motion for summary judgment is ripe for review.

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R.

Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Moreover, the court is not required to go on a fishing expedition in search of relevant evidence.  The court must only consider the evidence that the parties cite to in their summary-judgment filings.  Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

B.S. pursues claims against the remaining Defendants under 42 U.S.C.

§ 1983.  The text of 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or causes to be subjected,
> any citizen of the United States or other person . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution
> . . . shall be liable to the party injured in action at law, suit in equity,
> or other proper proceeding for redress."

The statute "is not a source of substantive rights, but merely a method to vindicate

violations of federal law committed by state actors." *Pappas v. City of Lebanon*,

331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536

U.S. 273, 284–85 (2002)). To establish a claim under § 1983, a plaintiff must show

that (1) the conduct complained of was committed by persons acting under color of

state law; and (2) the conduct violated a right, privilege, or immunity secured by

the Constitution or laws of the United States.  *Harvey v. Plains Twp. Police Dep't*,

421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

For purposes of § 1983, "person" includes local government units and

municipalities.  *See Monell*, 436 U.S. at 690.  With respect to B.S.'s claim against

York County, *Monell* also instructs that local governments cannot be held

vicariously liable for the constitutional violations committed by its employees.  *Id.*

at 690–94.  Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  Put another way, a local governing body "can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes" a policy or custom.  *Id.* at 690–91.

Thus, to succeed on a "*Monell* claim," a plaintiff like B.S. must identify an established municipal policy or custom and show that the same was the moving force behind the asserted constitutional derivation or injury.  *Lesher v. Zimmerman*, --- F. App'x ----, No. 19-1663, 2020 WL 4581604, at *3 (3d Cir. Aug. 10, 2020) (quoting *Bd. Of Cty. Comm'rs v. Brown*, 520 U.S. 397, 397 (1997)).  To the latter point, just like any other § 1983 claim, a failure to establish "the occurrence of a constitutional deprivation" is fatal to a *Monell* claim. *See Gardner v. Luzerne Cty.*, 645 F. Supp. 2d 325, 343 (M.D. Pa. 2009) (dismissing *Monell* claims where there existed no constitutional violation in the action); *see also Lesher*, 2020 WL 4581604, at *4 (affirming the dismissal of *Monell* claim as a matter of law because the plaintiff had failed to plead a constitutional violation under the state-created danger theory of liability against the individual defendant) (citing *Sanford v. Stiles*, 456 F.3d 298 (3d Cir. 2006) (holding that "in order for

municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights.")).

Here, no one contests that B.S. can satisfy the first prong of any § 1983 claim: that the remaining Defendants are "persons acting under the color of state law."   But, insofar as the merits are concerned, the remaining Defendants vigorously contest the second prong.

Regarding the constitutional-violation prong of § 1983, B.S. rests his claims on the Due Process Clause of the Fourteenth Amendment, which prohibits States from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1.  Indeed, B.S. invokes the substantive component of that Clause.  *See Daniels v. Williams*, 474 U.S. 327, 336–39 (1986) (Stevens, J., concurring) (identifying and discussing the components of the Due Process Clause).  The substantive component serves to "protect[] individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (quoting *Daniels*, 474 U.S. at 331).

More precisely, B.S. claims that the remaining Defendants deprived him of the substantive-due-process right to bodily integrity and to be free from bodily harm.  And to overcome the well-established principle that "a State's failure to protect an individual against private violence simply does not constitute a violation

29

of the Due Process Clause," B.S. premises his claims on the state-created danger and special-relationship theories of liability. *Deshaney v. Winnbeago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).

With respect to the pending motion for summary judgment, the remaining Defendants lodge several arguments. Initially, the remaining Defendants contend that the court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine. They also assert that collateral estoppel precludes B.S. from relitigating a particular issue, and that both Colin and Rohrbaugh are entitled to absolute[4] and qualified immunity. Furthermore, the remaining Defendants contend that, on the merits, B.S. fails to establish a violation of the state-created danger doctrine, no special relationship existed when Witmer abused B.S., and the *Monell* claim fails as a matter of law.

Because the remaining Defendants have called into question the court's subject-matter jurisdiction under *Rooker-Feldman*, the court begins there.

---

[4] On the following point regarding applicability of absolute immunity, the parties agree and their parallel positions are consistent with pertinent legal authority. (*Compare* Doc. 53, p. 29, *with* Doc. 66, pp. 25–29.) The court, therefore, dispenses with a discussion about the context or application of absolute immunity in these circumstances. Colin and Rohrbaugh are entitled to absolute immunity for (1) actions or conduct that occurred after the filing of the emergency shelter petition and during the dependency proceedings; and (2) any recommendations Colin or Rohrbaugh made in the January 8th emergency shelter petition. (*See id.*)

### A. *Rooker-Feldman* Does Not Preclude Subject-Matter Jurisdiction.

Under the *Rooker-Feldman* doctrine, district courts are deprived of

jurisdiction "over suits that are essentially appeals from state-court judgments."

*Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir.

2010) ("*Great Western*").  The doctrine derives its namesake from two Supreme

Court cases: *Rooker v. Fidelity Trust Company*, 263 U.S. 413 (1923) and *District*

*of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  Those cases

"exhibit the <u>limited</u> circumstances in which [the Supreme Court's] appellate

jurisdiction over state-court judgments . . . precludes a United States district court

from exercising subject-matter jurisdiction in an action it would otherwise be

empowered to adjudicate under a congressional grant of authority." *Exxon Mobile*

*Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005) ("*Exxon Mobile*")

(emphasis added and citations omitted).

Indeed, in *Exxon Mobile*, the Supreme Court clarified that the doctrine is

"limited" and "narrow," and "confined to cases of the kind from which the doctrine

acquired its name: cases brought by state-court losers complaining of injuries

caused by state-court judgments rendered before the district court proceedings

commenced and inviting district court review and rejection of those judgments."

544 U.S. at 284, 291; *see Lance v. Dennis*, 546 U.S. 459, 464, 466 (2006) (per

curiam) (reemphasizing the limited and narrow nature of the doctrine).  The Court

further explained that the doctrine "does not otherwise override or supplant

preclusion doctrine." *Exxon Mobile*, 544 U.S. at 284.  In fact, when "a federal

plaintiff present[s] some independent claim, albeit one that denies a legal

conclusion that a state court has reached in a case to which he was a party . . . ,

then there is jurisdiction and state law determines whether the defendant prevails

under principles of preclusion." *Exxon Mobile*, 544 U.S. at 293 (alteration in

original; citations and quotation marks omitted).

After *Exxon Mobile*, the Third Circuit concluded "that there are four

requirements that must be met for the *Rooker-Feldman* doctrine to apply[.]"

*Great Western*, 615 F.3d at 166.  Those requirements concern whether: (1) the

federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused

by [the] state-court judgments"; (3) the state-court judgments were made before the

federal plaintiff filed his or her suit; and (4) the plaintiff is "inviting the district

court to review and reject the state judgments." *Id.* (citing and quoting *Exxon

Mobile*, 544 U.S. at 293).  The "closely related" second and fourth requirements

are the most critical "to determining whether a federal suit presents an

independent, non-barred claim." *Id.* at 166, 168.

The second requirement may "be thought of as an inquiry into the source of

the plaintiff's injury." *Great Western*, 615 F.3d at 166 (citation omitted).  "When

the source of the injury is the defendant's actions (and not the state court

32

judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court[.]" *Id.* at 167.  In that scenario, "*Rooker-Feldman* is not a bar to federal jurisdiction." *Id.* (citations omitted).

While the timing of the injury may serve as a "useful guidepost" in determining the source of a federal plaintiff's injury, tracing the source of the injury may be more complicated when the plaintiff complains of an injury that bears some relation to a state-court proceeding. *Id.*  Nevertheless, when a federal plaintiff's injury stems from a third-party's actions, it can be said that the source of the injury is not a state-court judgment. *See id.* at 167–68 (citing *McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006)).

Regarding the fourth "review and reject" requirement, it "concerns whether the federal court must conduct 'prohibited appellate review' of state-court decisions." *In re Phila. Entm't & Dev. Partners*, 879 F.3d 492, 500 (3d Cir. 2018) (quoting *Great Western*, 615 F.3d 169).  "'Prohibited appellate review' means 'a review of the proceedings already conducted by the 'lower' tribunal to determine whether it reached its result in accordance with law.'" *Id.*  So long as the federal district court is not required to review the "'bona fides of the prior [state-court] judgment,' the federal court 'is not conducting appellate review, regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment.'" *Id.*  There, *Rooker-Feldman* would not apply

"because the plaintiff is not 'complaining of legal injury caused by a state court

judgment because of a legal error committed by the state court.'"  *Id.*

In this case, the parties do not identify or discuss the *Exxon Mobile*

requirements.  The parties, instead, focus almost exclusively on whether this

federal action is "inextricably intertwined" with state-court orders issued by Judge

Strong.  (*See* Doc. 53, pp. 33–34; Doc. 66, pp. 31–33, 35; Doc. 67, pp. 19–20.)  In

so doing, the parties rely on pre-*Exxon Mobile* cases for stating the test and, thus,

seem to believe that the phrase "inextricably intertwined" is the governing standard

for resolving this issue.  (*See id.*)

In *Great Western*, however, the Third Circuit reiterated that caution must be

exercised when "'relying on . . . pre-*Exxon* [*Mobile*] formulation[s] of the *Rooker-*

*Feldman* doctrine,' which focused on whether the state and federal suits were

'inextricably intertwined.'"  615 F.3d at 169 (quoting *Gary v. Braddock Cemetery*,

517 F.3d 195, 200 n.5 (3d Cir. 2008)).  That phrase "has no independent context;"

rather, "it is simply a descriptive label attached to claims that meet the

requirements outlined in *Exxon Mobile*."  *Id.* at 170 (quoting *Hoblock v. Albany*

*Cty. Bd. of Elections*, 422 F.3d 77, 87 (2d Cir. 2005)).  In other words, after *Exxon*

*Mobile*, when "a federal plaintiff brings a claim, whether or not raised in state

court, that asserts injury caused by a state-court judgment and seeks review and

reversal of that judgment, the federal claim is 'inextricably intertwined' with the state judgment." *Great Western*, 615 F.3d at 170 (citations omitted).

Even though the parties' do not discuss the *Exxon Mobile* requirements, this court, mindful of the scope of the *Rooker-Feldman* doctrine, is still satisfied that it has subject-matter jurisdiction over B.S.'s federal case.

### 1. The Second And Fourth Requirements Of The *Rooker-Feldman* Doctrine Are Not Met.

In issuing the decisions that are referenced in the fact section above, Judge Strong was tasked with determining whether B.S. was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." *See* 42 Pa. C.S.A. §§ 6302, 6341(c). Furthermore, after finding B.S. dependent, Judge Strong was required to make decisions regarding his custody and placement that considered B.S.'s safety, protection and physical, mental, and moral welfare. *See* 42 Pa. C.S.A. §§ 6351(a), (e), (f). And, in awarding custody to Witmer, Judge Strong was also to consider his criminal convictions and determine that, in light thereof, he did not pose a threat of harm to B.S. *See* 23 Pa. C.S.A. § 5329.

While B.S., in hindsight, might understandably take issue with Judge Strong's decisions, the court does not understand B.S. to ask this court to review those decisions and conclude that they were not in accordance with the law. Instead, B.S. asks this court to examine the actions and conduct of third parties

with respect to certain investigative and administrative tasks, which, according to B.S., set the stage for Judge Strong's decisions and the eventual sexual abuse.

Based on the court's understanding of B.S.'s claims in this case, B.S. is not inviting appellate review or asking for Judge Strong's decisions to be overruled. The court does not need to review or reject any portion of the same for the merits of this case to be reached. This is not to say that Judge Strong's decisions (or her findings) cannot have some preclusive effect. But that is a separate matter, which is addressed in the next section.

Additionally, by focusing on the conduct of third parties, the source of B.S.'s claimed injury is traceable to the remaining Defendants rather than Judge Strong's decisions. For these reasons, while also cognizant of the doctrine's intended scope, the court concludes that *Rooker-Feldman* is not a bar to federal jurisdiction in this case.

### B. Collateral Estoppel Bars B.S. From Relitigating The Issue Of Whether Witmer Posed A Threat Of Harm Based On His Prior Convictions.

In their answer to the complaint, the remaining Defendants asserted the affirmative defense of collateral estoppel. (Doc. 48, p. 24.) Now, on summary judgment, they argue that collateral estoppel bars B.S. from relitigating whether Witmer posed an unreasonable threat of harm based on his criminal history. (Doc. 53, pp. 30–33.) "[H]aving concluded [the court's] jurisdictional inquiry," the

36

court's next step is to consider this issue and "determine the preclusive effect[, if any,] of . . . prior state-court judgments." *Great Western*, 615 F.3d at 173.

Under the Constitution's Full Faith and Credit Clause,[5] as implemented by 28 U.S.C. § 1738,[6] this court must give to a state-court judgment the "same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Consistent with that mandate, the doctrine of collateral estoppel, or issue preclusion, generally "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)); *accord Vignola v. Vignola*, 39 A.3d 390, 393 (Pa. Super. Ct. 2012) (defining the Pennsylvania doctrine in similar terms).

To determine whether collateral estoppel applies here, with respect to Pennsylvania state-court orders, the preclusion law of Pennsylvania controls. *See,*

---

[5] The Full Faith and Credit Clause provides: "Full faith and credit shall be given in each state to the . . . judicial proceedings of every other state. And the Congress may by general laws prescribe the manner in which such . . . proceedings shall be proved, and the effect thereof." U.S. CONST. amend. Art. IV, § 1.

[6] This statute provides that the judicial proceedings of any State "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738.

*e.g., Migra*, 465 U.S. at 87 (clarifying that, on remand, the district court was to apply the preclusion law of Ohio to determine whether the plaintiff's § 1983 claims were barred by collateral estoppel).  Under Pennsylvania law, collateral estoppel applies if:

> (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*E.K. v. J.R.A.*, --- A.3d ----, 2020 WL 4558562, at *8–*9 (Pa. Super. Ct. Aug. 7, 2020) (quoting *Vignola*, 39 A.3d at 393).

According to the remaining Defendants, B.S.'s claims are tethered to a determination about whether Witmer posed an unreasonable threat of harm to him. (*See* Doc. 53, pp. 31, 33.)  The remaining Defendants contend that, because Judge Strong ruled that Witmer did not pose an unreasonable threat of harm because of his 1989 and 1991 convictions, B.S. is barred from relitigating that issue.  (Doc. 53, pp. 31–33.)

In opposition, B.S. does not disagree with the remaining Defendants' characterization of his claims.  But he also does not squarely focus on the more discreet issue that the remaining Defendants target; instead, he focuses more broadly on his claims.  (*See, e.g.*, Doc. 66, p. 29) (asserting that "[c]ollateral

estoppel does not bar [his] <u>claims</u> under 42 U.S.C. § 1983 against the [remaining] Defendants.") (emphasis added).  Of course, the court agrees with B.S. to that extent.  Judge Strong did not decide whether his constitutional rights had been violated by the remaining Defendants or that any municipal customs were the moving force behind a violation of a constitutional right.  Thus, B.S. may proceed on his constitutional claims.

The court nonetheless agrees with the remaining Defendants – if it is what they are truly arguing – that the more discreet issue about the threat of harm Witmer posed to B.S. was conclusively decided by Judge Strong.  As the court already mentioned, Judge Strong's orders included findings that B.S. was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." *See* 42 Pa. C.S.A. §§ 6302, 6341(c).  Furthermore, Judge Strong was required to make decisions regarding B.S.'s custody and placement that considered his safety, protection and physical, mental, and moral welfare.  *See* 42 Pa. C.S.A. §§ 6351(a), (e), (f).  And, in awarding custody to Witmer, Judge Strong was further required by law to consider his criminal convictions and determine that, in light thereof, he did not pose a threat of harm to B.S.  *See* 23 Pa. C.S.A. § 5329.

When considering Witmer's convictions, which was obviously essential to the placement and custody decisions that she made, Judge Strong found that

Witmer posed no threat of harm to B.S.  (Doc. 54, ¶¶ 38, 69.)  She further

determined that Witmer was a "fit and willing relative" and that the children were

"safe" with him.  (*Id.* ¶ 46.)  What is more, when Judge Strong expressed her

finding with respect to Witmer's threat of harm, B.S., via his guardian ad litem,

Attorney Worley, was present and able to contest the issue.

Rather than contest the issue, Attorney Worley actually represented to Judge

Strong that the children were "clear" that "they want[ed] to stay" with Stough and

Witmer, *id.* ¶ 30, and then agreed with R.S. and York County CYF that the

children should remain with them, *id.* ¶¶ 44–45.  In addition, during the November

2013 status hearing, when Attorney Worley brought up the issue of performing a

threat-of-harm evaluation for Witmer, which Witmer was willing to undergo,

Judge Strong denied the request.  She responded by stating that she had already

determined that Witmer's past convictions did not "indicate that he would possess

a threat of harm to the children."  (Doc. 54, ¶ 69.)

To date, as far as this court is aware, neither Judge Strong's orders nor her

findings regarding Witmer's threat of harm to B.S. have ever been reversed or

vacated, and no appeal is pending.  B.S., moreover, does not raise any equitable

exceptions to collateral estoppel.  *Cf.*, *e.g.*, *Fahs ex rel. Fahs v. Red Lion Area Sch.

Dist.*, No. 15-1108, 2018 WL 8131758, at *5–*7 (M.D. Pa. Mar. 8, 2018)

(dispatching with several equitable exceptions).

In sum, the court concludes that the elements of collateral estoppel under Pennsylvania law are satisfied.  B.S. is collaterally estopped from relitigating the specific issue of whether Witmer posed a threat of harm to him based on his criminal past.

### C. The Court Will Award Summary Judgment To The Remaining Defendants On B.S.'s Claims Premised On The Special-Relationship And State-Created Danger Theories Of Liability.

To frame the context of the special-relationship and state-created-danger theories of liability, the court begins with a brief overview of the 1989 Supreme Court decision in *DeShaney*.  There, a child and his mother (the petitioners) sued a county, social workers, and other local officials (the respondents) under Section 1983.  489 U.S. at 191, 193.  The details of the case are "undeniably tragic."  *Id.* at 191.

The respondents had many "reason[s] to believe" the child's father was abusing him.  *Id.* at 191, 191–93.  In fact, at one point, the respondents secured temporary custody of the child before a juvenile court returned him to the father's custody.  *Id.* at 192.  After returning him to his father's custody, the respondents still had suspicions that the father was abusing the child, but did not intervene or take protective action.  *Id.* at 192–93.

The petitioners' lawsuit ultimately arose after the father was convicted for beating the child so severely that the child suffered significant and permanent brain

damage.  *Id.* at 191, 193.  With respect to the § 1983 claim, the petitioners sued on grounds that the "respondents had deprived [the child] of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which the[] [respondents] knew or should have known."  *Id.* at 193.  On certiorari, the Supreme Court affirmed the award of summary judgment for the respondents, holding that the respondents' failure to act did not deprive the child of his liberty in violation of the Constitution.  *Id.* at 191.

In reaching its holding, the Court turned to the text and history of the Due Process Clause, as well as past cases discussing the Clause.  *Id.* at 195–97.  Based on its review of those sources, the court concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id.* at 197.

The Court further rejected the petitioners' argument that a "special relationship" existed, such that the State had an affirmative (and constitutional) duty to protect the child "because the State knew that [the child] faced a special danger of abuse . . . and specifically proclaimed . . . its intention to protect him against that danger."  *Id*.  The Court acknowledged that the Due Process Clause may impose upon States an affirmative duty to care for and protect an individual when a State affirmatively restrains the "individual's freedom to act on his own

42

behalf – through incarceration, institutionalization, or other similar restraint on personal liberty[.]" *Id.* at 200. In that scenario, an individual has been deprived of liberty "triggering the protections of the Due Process Clause[.]" *Id.* Thus, the Court took the view that a State's "affirmative duty to protect arises not from the State's knowledge of [an] individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* (citation omitted).

On the facts of the case, however, the State did not have an affirmative duty to protect the child, even though it had reason to believe abuse was ongoing and had previously taken custody of the child. The Court explained:

> While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.* at 201 (emphasis added). In other words, "[u]nder [the] circumstances [of the case], the State had no constitutional duty to protect" the child and there existed no due process violation. *Id.*

At its core, "*DeShaney* stands for the proposition that the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody." *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (footnote

omitted).  But from the above block-quoted language in *DeShaney* grew the special-relationship and state-created-danger theories of liability.

### 1. No Special Relationship Existed When Witmer Began Abusing B.S.

With respect to the special-relationship exception, 30 years ago, the Third Circuit acknowledged that, "when [a] state enters into a special relationship with a particular citizen, it may be held liable for failing to protect him or her from the private actions of third parties."  *D.R. ex rel. L.R.*, 972 F.2d at 1369 (citing *Cornelius v. Town of Highland Lake Ala.*, 880 F.2d 348, 352 (11th Cir. 1989)). Thereunder, "in circumstances where the state imposes limits upon an individual's 'freedom to act on his own behalf,' that deprivation of liberty triggers a corresponding duty under the Due Process Clause."  *D.N. ex rel. Nelson v. Snyder*, 608 F.Supp.2d 615, 623 (M.D. Pa. 2009) (quoting *DeShaney*, 489 U.S. at 200).

The remaining Defendants argue that they are entitled to summary judgment on Count II of the complaint, which alleges a § 1983 claim under the special-relationship theory.  According to the remaining Defendants, no special relationship existed when Witmer began sexually abusing B.S. in 2017.  (Doc. 53, pp. 42, 44.)  Based on the evidence presented, viewed in B.S.'s favor, no reasonable juror could conclude that a special relationship existed when Witmer began abusing B.S.  Consequently, the court agrees with the remaining Defendants that they are entitled to summary judgment.

Initially, while York County CYF had legal custody of B.S., he very likely had a "special relationship" with York County CYF (and, thus, the remaining Defendants).  *See generally Harris ex rel. Litz v. Lehigh Cty. Office of Children and Youth Servs.*, 418 F.Supp.2d 643, 647 (E.D. Pa. 2005) (citing *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000)) (observing that when "the State places a child in State-regulated foster care, the State has entered into a 'special relationship' with that child which imposes upon it certain affirmative duties.")  But it is an undisputed fact that Witmer did not begin abusing B.S. until January 2017.  (*See* Doc. 54, ¶¶ 78, 84; Doc. 61-1, pp. 25–26.)  By that time, nearly three years had passed since Judge Strong issued her order terminating the dependency proceedings, terminating York County CYF's involvement with the family, and transferring legal custody away from York County CYF to Witmer and Stough. (Doc. 54, ¶¶ 76–77.)

While Judge Strong directed in her order terminating York County CYF's involvement that future custody of the children could not be transferred "without prior notification to [York County CYF]," Doc. 61-34, p. 3, no reasonable juror could accept that language to mean B.S. remained under York County CYF's control or custody, or that York County CYF was bestowed with continuing affirmative duties to protect B.S. in the interim.  Given York County CYF's termination, a reasonable juror could only view that language as imposing a

notification requirement so as to give York County CYF the option of investigating
and intervening in any custody determination.

Also, when the abuse occurred, the children were mostly living with R.S.
That was in accordance with Judge Strong's order issued in the custody action
initiated by R.S. and that did not involve York County CYF.  (Doc. 54, ¶ 83; *see*
Doc. 61-1, p. 23.)  B.S., moreover, has not pointed to evidence suggesting that
York County CYF undertook (or attempted to undertake) legal or physical custody
of him after Judge Strong issued her order terminating York County CYF's
involvement or while the abuse was ongoing.  Consequently, no reasonable juror
could conclude that B.S. was "in any meaningful sense, in state custody during the
time that the abuse occurred."  *Bryan v. Erie Cty. Office of Children & Youth*, 861
F.Supp.2d 553, 565, 572–73, 583 (W.D. Pa. 2012) (awarding summary judgment
to the defendants on special-relationship theory where the child-plaintiff was
formally adopted by his foster parents and then abused months later by a foster
child placed in the same family's home).

The court is also unpersuaded that a reasonable juror could conclude that
York County CYF's investigation into allegations about Witmer in 2016 worked to
re-establish a "special relationship" with B.S.  It is undisputed that Witmer did not
abuse B.S. until the next year, and no allegations of abuse were made or found in
2016. (See Doc. 61-36, p. 25.)  Furthermore, aside from investigating the

46

allegations, York County CYF did nothing more.  Indeed, it did not intervene or take protective measures.  At the same time, York County CYF undeniably expressed that, "based on Witmer's past criminal history," the "children [we]re placed at imminent risk of abuse."  (*Id.*)  But even so, while investigating the allegations against Witmer, York County CYF was in a position akin to the respondents in *DeShaney*.

When the respondents in *DeShaney* did not have custody of the child-plaintiff and were alerted to and investigated allegations of abuse, they similarly took no action to intervene or protect the child.  *See* 489 U.S. at 192–93 (explaining that, after the juvenile court returned the child to his father's custody, caseworkers investigated reports made by emergency room personnel and also made monthly visits to the father's home but did nothing more despite suspicions of ongoing abuse).  Yet the Supreme Court concluded that there was no substantive-due-process violation.  While possibly unsettling on the facts of this sad case, the same logic should apply to York County CYF with respect to its investigation of the allegations against Witmer in 2016.  *See also Hayes v. Erie Cty. Office of Children and Youth*, 497 F. Supp. 2d 684, 688–89, 693–95 (W.D. Pa. 2007) (granting motion to dismiss where the plaintiffs failed to allege a special relationship because the child was not in the defendants' custody when the abuse – reports of which were investigated – occurred).  That is especially true considering

the Supreme Court's pronouncement that governments do not "become the permanent guarantor of an individual's safety by having once offered him shelter." *DeShaney*, 489 U.S. at 201; *see also Hayes*, 497 F. Supp. 2d at 695 ("If the Plaintiffs' argument is taken to its logical conclusion, then child welfare agencies, having once played a role in the placement of a child . . . will . . . always assume a 'special relationship' . . . for an indefinite period of time . . . notwithstanding the termination of the agency's custodial relationship with the child."). Judge Strong had relinquished York County CYF's custody one to two years before the 2016 allegations about Witmer arose.

For these reasons, no reasonable juror could conclude that a "special relationship" existed between B.S. and York County CYF when the abuse occurred in 2017. By extension, no reasonable juror could conclude that the remaining Defendants had a "special relationship" with B.S. during that period. The remaining Defendants, therefore, did not violate B.S.'s constitutional rights under a special-relationship theory. The court will award summary judgment to the remaining Defendants on Count II based on the "special relationship" theory of liability.

### 2. B.S. Cannot Satisfy The First Or Fourth Elements Of A State-Created Danger Claim.

In 1996, the Third Circuit "adopt[ed] the 'state-created danger' theory as a viable mechanism for establishing a constitutional violation under 42 U.S.C.

§ 1983." *Kneipp v. Tedder*, 95 F.3d 1199, 1201, 1211 (3d Cir. 1996).  The theory is derived from the emphasized portion of the *DeShaney* passage that this court block quotes above.  *See, e.g., Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003) (citations omitted).  Under the state-created-danger theory of liability, a State and state actors can be liable "when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'"  *Bright*, 443 F.3d at 281 (quoting *Schieber*, 320 F.3d at 416).

To establish a state-created-danger claim, a plaintiff must demonstrate that: (1) "the harm ultimately caused was foreseeable and fairly direct;" (2) "a state actor acted with a degree of culpability that shocks the conscience;" (3) "a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general;" and (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *L.R. ex rel. N.R. v. School Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2016) (citing *Bright*, 443 F.3d at 281).

49

If a plaintiff fails to establish any of these elements, a claim premised on the theory of state-created danger will be precluded. *Bryan*, 861 F. Supp. 2d at 578 (citing *Morse v. Lower Marion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir. 1997); *Smith v. School Dist. of Phila.*, No. 07-2080, 2009 WL 667455, at *3 (E.D. Pa. Mar. 10, 2009)). Therefore, to "avoid entry of . . . summary judgment in this case . . . [B.S.] must present evidence which shows there is a genuine dispute of material fact as to each element of [his] state-created danger claim." *Id.* (citing Fed. R. Civ. P. 56(c); *Smith*, 2009 WL 667455, at *3).

Here, the remaining Defendants contest the second and fourth elements, arguing that "B.S. [cannot] establish that [their] conduct shocks the conscience or that Witmer's abuse is attributable to the affirmative exercise of state authority." (Doc. 53, p. 37.) Because no reasonable juror could find for B.S. on the fourth element, and the failure to establish one element is fatal to the claim, the court initially focuses there.

To establish the fourth element, there are "three necessary conditions" that a plaintiff must satisfy. *Ye v. United States*, 484 F.3d 634, 639 (3d Cir. 2007). They concern whether: (1) "a state actor exercised his or her authority;" (2) "the state actor took an affirmative action;" and (3) "th[e] act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." *Id.* (citing *Bright*, 443 F.3d at 281–82). Regarding the third condition,

"[t]here must be a direct causal relationship between the affirmative act . . . and plaintiff's harm." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006). Indeed, "the fourth element is satisfied [only] where the state's action was the 'but for cause' of the danger faced by the plaintiff." *Id.*

B.S. asserts that the remaining Defendants: (1) put him back with Witmer on November 16, 2012, despite awareness that Witmer was a convicted sex offender; (2) left B.S. with Witmer "from November 16, 2012 forward" under a safety plan; and (3) pulled Witmer's criminal history, and then left B.S. with Witmer despite awareness he was a convicted sex offender. (Doc. 66, p. 44.)  Even assuming that these acts all constitute "affirmative acts," no reasonable juror could conclude that the acts were the "but for cause" of the danger faced by B.S.  Intervening actions or events occurred, including the following:

- Judge Strong, who knew of Witmer's convictions, ruled and reemphasized that he did not pose a threat of harm to B.S. because the prior convictions were so old and there existed no evidence of subsequent issues;

- B.S. does not argue or squarely point to evidence that Judge Strong made her decisions based on any faulty assessments or reports;

- Attorney Worley, who represented B.S. in the state-court proceedings, affirmatively represented to Judge Strong that B.S. wanted to stay with Witmer and Stough;

- Judge Strong issued orders, in which she continued custody with Witmer and Stough, finding them to be "fit and willing relatives;" and,

- Judge Strong terminated the dependency proceedings and York County CYF's involvement with B.S.'s family years before the abuse ever occurred.

What is more, for five years prior to when York County CYF became involved and the above acts occurred, B.S. had lived with Witmer and Stough off and on without incident.  And it is an admitted fact that no abuse occurred while B.S. was in York County CYF's custody.

These facts, viewed collectively, would only permit a reasonable juror to conclude that the acts complained of –occurring years prior to the abuse – did not leave B.S. more vulnerable to danger than if the state had not acted at all.  Drawing on language from *Henry v. City of Erie*, which invoked the first state-created danger element, the complained-of acts merely "took place somewhere along the causal chain that ultimately led to [B.S.'s] harm." 728 F.3d 275, 285 (3d Cir. 2013).  But, for purposes of B.S.'s claims, they were "separated from the ultimate harm by a lengthy period of time and intervening forces and actions," *id.*, thereby failing to qualify as the "but for cause" of the danger B.S. faced.

In a similar vein, while the remaining Defendants do not argue that B.S. cannot establish the first element of a state-created danger claim, the court concludes that no reasonable juror could find for B.S. on that element.  In *Henry*, the Third Circuit explained that to "fulfill the 'fairly direct' requirement of the [first element]," a plaintiff must demonstrate "that state officials' actions

'precipitated or we[re] the catalyst for' the harm for which the plaintiff brings suit." 728 F.3d at 285 (quoting *Morse*, 132 F.3d at 910).  The court further defined "precipitate" as meaning "to cause to happen or come to a crisis suddenly, unexpectedly, or too soon."  *Id.* (citation omitted).

Given the large amount of time that passed between the purported affirmative acts and the harm that B.S. experienced, coupled with the various decisions made by Judge Strong and the representations by Attorney Worley, no reasonable juror could conclude that the remaining Defendants' "affirmative acts" precipitated or were the catalyst for B.S.'s harm.  *See also Henry*, 728 F.3d at 285 (reversing district court's denial of qualified immunity on state-created danger claim where, in part, the plaintiffs did not plausibly allege "that [the] defendants' actions were close in time and succession to the ultimate harm;" instead, the defendants' actions were "separated from the ultimate harm by a lengthy period of time and intervening forces and actions.")

For these reasons, the court will enter summary judgment for the remaining Defendants on Count I.[7]

---

[7] Because of the court's determinations on the merits of Counts I and II, the court dispenses with a detailed discussion of qualified immunity.  Colin and Rohrbaugh are entitled to that immunity by virtue of the fact that B.S. cannot establish a violation of a constitutional right.  *See Williams v. City of York, Pa.*, --- F.3d ----, 2020 WL 4249437, at *4 (3d Cir. July 24, 2020) ("To resolve a claim of qualified immunity, [we] engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was clearly established at the time of the official's conduct." (quoting *L.R.*, 836 F.3d at 241 (internal quotation marks omitted)); *Karns v. Shanahan*, 879 F.3d 504, 520 (3d Cir. 2018) ("[T]he failure

### D. The Court Will Award Summary Judgment To York County On The *Monell* Claim In Count III.

As the court previously mentioned, to prevail on a *Monell* claim, a plaintiff

must identify an established municipal policy or custom and show that the same

was the moving force behind the asserted constitutional derivation or injury.

*Lesher*, 2020 WL 4581604, at *3 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S.

at 397.  And just like for any other § 1983 claim, a failure to establish "the

occurrence of a constitutional deprivation" is fatal to a *Monell* claim.  *See Gardner*,

645 F. Supp. 2d at 343.  Because no reasonable juror could find that B.S.

establishes the deprivation or violation of a constitutional right under the

Fourteenth Amendment, the court must enter judgment for York County on Count

III as a matter of law.  *See Lesher*, 2020 WL 4581604, at *4, *supra*.; *Hammon v.*

*Kennett Twp.*, 746 F. App'x 146, 150 (3d Cir. 2018) (affirming the district court's

dismissal of *Monell* claim).

CONCLUSION

For the foregoing reasons, the court will grant the remaining Defendants'

motion for summary judgment.  The court, moreover, will enter summary

judgment for the remaining Defendants on Counts I to III in the amended

---

of either prong will result in application of qualified immunity.") (citing *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012)).

complaint.  An appropriate order will follow that is consistent with this

memorandum.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 10, 2020